JAMES R. HERBERT and PETER W. HAIRSTON, trading as HERBERT & HAIRSTON, *vs.* SARAH H. GRAY.

*Construction of the Act of 1872, ch. 270—Not Retrospective in its operation—Husband and Wife.*

The Act of 1872, ch. 270, provides, that "any married woman may be sued jointly with her husband in any of the Courts of this State, or before any justice of the peace, on any note, bill of exchange, single bill, bond, contract or agreement, which she may have executed jointly with her husband

34        v. 38.

---

---

and may employ counsel and defend such action or suit, separately or jointly with her husband, and judgments recovered in such cases, shall be liens on the property of defendants, and may be collected by execution or attachment, in the same manner as if the defendants were not husband and wife." HELD :

That this Act is not retrospective in its operation, and does not authorize a suit at law against a husband and wife, upon their joint note, executed prior to the passage of the Act.

APPEAL from the Circuit Court for Calvert County.

The case is fully stated in the dissenting opinion of Judge MILLER.

The cause was argued before BARTOL, C. J., STEWART, GRASON, MILLER and ROBINSON, J.

*Frank. H. Stockett,* for the appellants.

The words of the Act of 1872, ch. 270, are too express and plain to be mistaken as to the intention of the Legislature to include antecedent contracts ; and this being so, there is no room for interpretation. *Baugher vs. Nelson,* 9 *Gill,* 303 ; *State, &c. vs. Norwood, et al.,* 12 *Md.,* 206 ; *Clark vs. Mayor, &c., of Baltimore,* 29 *Md.,* 283 ; *Alexander vs. Worthington,* 5 *Md.,* 485.

There is nothing in the Constitution of the United States prohibiting the Legislature from passing such a law. 2 *Story on the Cons., sec.* 1398 ; *Satterlee vs. Matthewson,* 2 *Peters,* 412 ; *Baugher vs. Nelson,* 9 *Gill,* 305 ; *Watson vs. Mercer,* 8 *Peters,* 110 ; *Charles River Bridge vs. Warren Bridge,* 11 *Pet.,* 540.

Nor is there anything in the Declaration of Rights, or the Constitution of Maryland, in conflict with such right or power. *Baugher vs. Nelson,* 9 *Gill,* 306 ; *Wilson vs. Hardesty,* 1 *Md. Ch. Dec.,* 66 ; *Harrison vs. State, use of Harrison,* 22 *Md.,* 492 ; *Cooley's Constitutional Limitations,* 370.

Nor is there any such limitation on such a power, because it was an instance of legislative usurpation, or the violation of the social compact, and the purposes and ends for which governments in this country were instituted. *Regent's Case,* 9 *G. & J.,* 408; *Harrison vs. State, use of Harrison,* 22 *Md.,* 492; *Goshen vs. Stonington,* 4 *Conn.,* 225; *State, use of Isaac, vs. Jones, et al.,* 21 *Md.,* 432; *Wilson vs. Hardesty,* 1 *Md. Ch. Dec.,* 66; *Sedgwick on Statutory and Constitutional Law,* 201, 202; *Dulany vs. Tilghman,* 6 *G. & J.,* 461; *Wilderman vs. Mayor, &c., of Baltimore,* 8 *Md.,* 551; *State, use of Trustees, &c. vs. Warren, et al.,* 28 *Md.,* 355; *Reynolds vs. Furlong,* 10 *Md.,* 318; *Atwell vs. Grant,* 11 *Md.,* 101; *Cooley's Constitutional Limitations,* 374.

No appearance for the appellee.

Grason, J., delivered the opinion of the Court.

The only question arising in this case is, whether the Act of 1872, chap. 270, is retrospective in its operation.

It is a clear and well settled rule of law that no statute will be held to be retroactive unless such an intention is clearly expressed in the statute. *Baugher vs. Nelson,* 9 *Gill,* 303; *State, use of the Mayor & C. C. of Baltimore vs. Norwood,* 12 *Md.,* 206; *Clark vs. the Mayor and City Council of Baltimore,* 29 *Md.,* 283, and *Davis, Adm'r, vs. Clabaugh,* 30 *Md.,* 508. In the last of these cases, this Court laid down the rule in the following clear and forcible language: "A statute ought not to have a retroactive operation unless its words are so clear, strong and imperative, that no other meaning can be annexed to them, or unless the intention of the Legislature could not be otherwise satisfied; and especially ought this rule to be adhered to, when such a construction would alter the pre-existing situation of parties, or would affect or interfere with their antecedent right." Has the Legislature

manifested an intention to make the statute now under consideration, retroactive in its operation, by words "so clear, strong and imperative that no other meaning can be annexed to them," or cannot the intention of the Legislature be satisfied by a different construction. The Act provides, that "any married woman may be sued jointly with her husband in any of the Courts of this State, or before any justice of the peace, on any note, bill of exchange, single bill, bond, contract, or agreement, which she may have executed jointly with her husband, and may employ counsel and defend such suit or action separately or jointly with her husband, and judgments recovered in such cases, shall be liens on the property of defendants, and may be collected by execution or attachment in the same manner as if the defendants were not husband and wife."

Before the passage of the Act of 1845, contracts of married women were void at law, but that Act made such contracts, entered into jointly with the husband, valid, made married women liable to suits at law in such contracts, and subjected their property to execution and attachment.

It has been contended that the Legislature, by using the past tense, "*may have executed*," clearly manifested its intention to include within the operation of the statute contracts entered into before the Act was passed, and that there is no room for construction. We do not concur in this view of the law. It does not say that a married woman may be sued on any contract entered into jointly with her husband *before* the Act was passed, or which she "*may have heretofore* executed." It is to be presumed that the Legislators who passed the Act in question, did so with full knowledge of the decisions of this Court, to which we have already referred, and that, if they had intended to include within the operation of the statute contracts made before its passage, they would have used apt words

to effect their object. This has not been done, and we mu st therefore be governed by the rule of construction, to whi ch we have before referred, and give the Act a prospective operation.

There is nothing in the language of the Act inconsistent with this construction. The words "may have executed," as the context shows, were used with reference to the time of instituting the suit, and therefore the past tense is correctly employed. They do not speak as of the time of passing the Act, and do not necessarily embrace contracts which had been executed before the Act was passed. Giving it this construction, the statute will operate upon a class of cases, clearly within its scope and operation, without "altering the pre-existing situation of parties, or affecting, or interfering with, their antecedent rights." The Act now under consideration is different in its language, and very different in its character and object from the Act of 1845, chap. 352, which was under review in *Baugher vs. Nelson*, and which was held to be retrospective in its operation. By the Act of 1704, chap. 69, usury, when pleaded and established by proof, was a bar to the action. The Act of 1845, provided that "in any suit or action hereafter to be brought in any Court of Law or Equity in this State, upon any bond, &c., or upon any contract, &c., whether the same relate to the loan of any money, &c., in which any person shall seek to avail himself of the provisions of the Act of Assembly of 1704, it shall be incumbent on such person to specially plead the same, and in such plea to set out the sums, both principal and interest, actually and fairly due on such bonds, &c., estimating the principal debt actually loaned or contracted for, with interest thereupon at the rate of six per cent. per annum." The language of that Act is very clear and comprehensive, and leaves no doubt as to its meaning and intention. It says, "that in any suit hereafter to be brought," that is in any suit brought after the

10th of March, 1846, the defendant, to avail himself of the defence of usury, must plead as required by the provisions of the Act of 1845. That Act had reference to the defence to an usurious contract, and the manner of making that defence, and looked to the pleading, and it clearly applied to the case then before the Court, notwithstanding the note sued on was dated before the passage of the Act, the suit having been brought after it went into operation. So this Court held, with respect to the Act of 1872, chap. 272, in the case of *Elliott vs. Elliott*, *ante,* 357.

The Act provides that, "in all cases where a divorce ' *a vinculo matrimonii* ' is decreed for adultery or abandonment, the Court may, in its discretion, decree that the guilty party shall not contract marriage with any other person during the lifetime of the other party," &c. The Act looks to the *time of the decree*, and says that in all cases where a decree is passed, &c., the Court may in its discretion decree, .&c. It was therefore held by this Court that the discretion was well exercised, although the acts for which the divorce was granted, had been committed and suit had actually been commenced before the passage of the Act.

The Act of 1872, chap. 270, has been under the consideration of this Court in the case of *Catherine Miller*, *by her next friend George Davis vs. Wilson and Suter*, at the present term. (Unreported case.)

In that case a foreign attachment issued in December, 1871, on a joint note of husband and wife, and was laid upon the real estate of the wife, and judgment of condemnation was rendered in June, 1872, and execution issued. The wife, by her next friend, filed a bill in the Circuit Court for Cecil County, for an injunction to stay the execution. The injunction was refused, and the case came to this Court upon appeal of the wife, and was submitted to the whole Bench, and all the Judges were of opinion

that she was entitled to the injunction, as the judgment of condemnation would relate back to the date of the attachment, which is a lien upon the property upon which it is laid, and thus defeat all intermediate liens, and held that the judgment was not authorized by the Act of 1872, whether it be construed as prospective or retrospective. The Court, however, in that case, had the Act of 1872 under its consideration, and we are authorized by Judges ALVEY and BRENT, who did not sit with us in this case, to state that they concur in the conclusion we have reached, that the Act is not retrospective in its operation and does not apply to a case such as the one now before us.

The judgment appealed from will therefore be affirmed.

*Judgment affirmed.*

(Decided 10th July, 1873.)

MILLER, J., delivered the following dissenting opinion, in which STEWART, J., concurred :

This suit was brought on the 27th of April, 1872, by the appellants against the appellee and her husband on their joint and several promissory note for $383.61, dated the 29th of March, 1869, payable to the order of the plaintiffs, at ninety days from date, at the Bank of Commerce. The husband was returned *non est*, but the wife being summoned appeared and pleaded her coverture in bar of the action. Upon demurrer to this plea the Court below gave judgment in favor of the defendant, and from that judgment this appeal has been taken by the plaintiffs.

The case has been argued by counsel for the appellants alone. No argument has been made on the part of the appellee. It involves the very important question, whether the Act of 1872, ch. 270, which took effect on the 1st of April, 1872, the date of its passage, authorizes a suit at law against a husband and wife, upon their joint note executed before that Act was passed. In considering

this question, we must look first to the general purpose and intent of the statute. It is an Act repealing the second section of the 45th Article of the Code of Public General Laws, entitled "Husband and Wife," and enacting a substitute in lieu thereof. By that section of the Code enacted in 1861, a very important change was made in the law of this State respecting the rights of married women over their property. It provides that all the property real and personal belonging to a married woman at the time of her marriage "she shall hold for *her separate use* with power of devising the same as fully as if she were a *féme sole,* or she may convey the same by a *joint deed* with her husband;" and then provides what interest he shall have in her property, if he survives her, and she dies intestate and leaving children or leaving none. This section is repealed by the Act of 1872, and a substitute enacted in *lieu thereof.* This substitute contains the whole of the original section with two most important additions. In the first place it provides that "where the husband is a lunatic or insane, and *has been* so found upon inquisition, and said finding *remains* unreversed and in force, she may convey" her property "as fully as if she were a *féme sole* by her *separate deed*" whether, the conveyance "be absolute or by way of mortgage." To this extent at least, I think it quite clear the purpose of the Legislature was to take out of the Code the original section, and put the substitute *back in its place,* to speak, take effect, and be operative with the other sections of the same Article as of the date of the Code itself. I cannot suppose that if a marriage has taken place since the Code and before the Act of 1872, and the husband becomes insane, the wife could not exercise the power of sale or mortgage of her property conferred by this substituted section, to support her lunatic husband if she chose so to do. The whole language of the statute clearly evidences this to be its purport and effect, and not to make a new

law or rule for marriages occurring after the passage of the Act.

The second addition made by this substitute, and upon which the present question arises, is in those words : "any married woman may be sued jointly with her husband in any of the Courts of this State, or before any justice of the peace, on any note, bill of exchange, single bill, bond, contract or agreement, which she may have executed jointly with her husband, and may employ counsel and defend such action or suit separately or jointly with her husband, and judgments recovered in such cases shall be liens on the property of defendants, and may be collected by execution or attachment in the same manner as if the defendants were not husband and wife ; *provided,* that in all cases where a married woman has made such contract or agreement as a *féme sole* under the seventh section of this Article, she may be proceeded against as therein provided."

It was decided by this Court at its last term, in the case of *Hall and Hume vs. Eccleston and Wife,* 37 *Md.,* 510, that one of the main purposes of the original section was to enable married women to maintain a *separate credit* independent of their husbands.    Having thus settled their property upon them for this purpose, the Legislature thought it right and just they should be responsible for their contracts of a certain description, like other persons, and be sued upon them in a Court of law, and their separate estates subjected to the payment of debts so contracted.    That was the object the Legislature had in view by the second addition to the original section made by the Act of 1872.    There is nothing in it unwise, or harsh, or inequitable.    It merely declares that married women shall not unite with their husbands and put their names and signatures to these contracts and thereby induce honest and *bona fide* creditors to part with their money, or merchandise, and then when pay-day comes, hold on to their

property, repudiate their honest obligations, and consummate cheats and frauds by pleas of coverture. It applies to them in a limited manner and to a limited extent the same rule of common honesty and morality, by which widows, unmarried women, and other persons having property, are bound when they contract debts. It deprives. them of no honest defences, but on the contrary enables them to employ counsel and defend the suits separately from their husbands. Fraud, duress, coercion, are left them as defences at law, and Courts of Equity are always open to hear their complaints.

Such being the purpose of this provision, the question is, has it a retroactive operation? Does it apply to and affect contracts that antedate its passage? Of the power of the Legislature to make it retroactive, I entertain- no doubt. Have they so made it? The rule is universal, that laws are to be so *construed* if possible, as to give them a prospective operation only. But in whatever strong terms this rule may be stated, it has always in every well considered case, been qualified by the controlling and paramount principle, that if the *language* of a statute is too express and plain to be mistaken, and that *language* gives to it a retroactive operation, then the Courts cannot indulge in construction. It is in my judgment a principle too plain for controversy, that Courts have no power to make retrospective language prospective only by a mere arbitrary declaration that thus it shall be, for that would be judicial legislation and overturn the maxim *est judicis dicere non dare leges.* The *words* of the law are *first* to be looked to for the purpose of ascertaining the legislative intent in this as in all other cases. Thus in the case of *Clark vs. The Mayor and City Council of Baltimore,* 29 *Md.,* 283, where the rule of prospective construction is most strongly stated, this Court has said that laws must be construed according to the legislative intent, and "to ascertain this, we are *first* to

consider the *words employed*, and interpret them accord-
ing to their plain, ordinary and natural import, having
some regard to their order and grammatical arrangement.
If they are clear, precise and unambiguous, the Legisla-
ture *must be understood to mean what it has plainly
expressed.*" Nor can the Courts look to consequences
where the language of a statute is clear and explicit.
These, if evil can only be avoided by a change of the law
itself, to be effected by legislation and not by judicial
action. *Sedgwick on Statutory and Constitutional Law,*
231. Least of all can they indulge in *supposition* as to
what was the intention of the draftsman of the Act, or of
those who may have voted for it. "Courts must not even
in order to give effect to what they may *suppose* to be the
intention of the Legislature, put upon the provision of a
statute a construction *not supported by the words,* even
although the consequences should be to defeat the object
of the Act." *Smith's Commentaries on Statutory Construc-
tion,* sec. 714. A very strong case illustrating these doc-
trines was recently decided by the Supreme Court of Ohio,
where the Court say they were satisfied, by considerations
outside of the *language,* that the Legislature intended to
enact something very different from what it did enact ;
but notwithstanding all this, they say *ita lex scripta est ;*
the language as it stands is clear, explicit and unequivo-
cal ; it is our legitimate function to interpret legislation,
but not to supply its omissions. *Woodberry & Co. vs.
Berry,* 18 *Ohio State Rep.,* 456. In this connection I cannot
refrain from quoting the terse and vigorous language of
the late Chief Justice LE GRAND, speaking for the Court,
in the case of *Alexander vs. Worthington,* 5 *Md.,* 485 :
" We are not at liberty to imagine an intent and bind the
letter of the Act to that intent ; much less can we indulge
in the license of striking out and inserting, and remodel-
ing with the view of making the letter express an intent
which the statute in its native form does not evidence."

I thus find that all the authorities raise a uniform protest against the power of Courts, so to deal with the language of a statute as to substitute the will of the judiciary for that of the Legislature, and declare that Judges in expounding, as well as citizens who are to obey it, must read the law as it is written without any arbitrary subtraction from, or addition to its meaning. In this respect it makes no difference whether the purpose be to determine whether the words of the law make it retroactive, or to ascertain their meaning in any other respect.

What then is the language of the law now to be dealt with? It is plainly this: "any married woman *may be sued* at law with her husband, on *any note*, &c., which *she may have executed* jointly with him." I cannot conceive how it is possible to raise an ambiguity on these words, or to affirm they are wanting in clearness or precision. How can they be made to declare that married women may be sued *only on such notes* as they *may execute after the law* takes effect, except by a mere arbitrary declaration that they shall mean this and nothing more. Punctuation may be disregarded or so made to accommodate the sense, but I cannot recognize the right of Judges so to deal with the grammar of a plain English sentence, as to change the past tenses of its verbs into future tenses. I have found no case in which any Court has ever attempted this, and yet in my judgment, it must be done here before the language of this Act can be deprived of its plain retroactive effect. No one can deny that the law became operative and spoke the legislative will just as effectually and imperatively the very instant after it was approved and signed by the Governor, as it does to-day. Its language is the same now as it was then. Now, reading it as speaking at that instant of time, as *law* then it undoubtedly was, and what did it proclaim? Did it not then instantly tell creditors of married women that they could at once go into the Courts of law and sue any mar-

ried woman on any of these designated notes or contracts *"which she may have executed?"* How is it possible to escape the retroactive effect of these words "may have executed," when we answer as we must, that the statute is to be read as speaking from the moment of its approval? They applied then to pre-existing contracts, and it will not do to give them one reading as of that date and another one now. If retrospective then, as I submit they clearly were, they are retrospective still. Surely the fact that other contracts have been executed since the passage of the law upon which it can also operate, does not alter the meaning of these words, or deprive them of any retroactive force they once had. In the case of *Baugher vs. Nelson,* 9 *Gill,* 299, the law undoubtedly operated upon contracts of loan made after its passage, but the Court did not for that reason think itself authorized to say that it did not also operate upon antecedent contracts. The language of that Act was *"in any suit or action hereafter to be brought upon any bond or contract of loan, &c.,"* and the Court held it to be too clear for dispute, that these terms embrace antecedent contracts of that character as well as subsequent ones. As a precedent, that case in my opinion ought to control and govern this, even if the language of the present law was less clear, explicit and strong than it is, and I am unable to see how *that decision can longer be regarded as law,* in view of the determination of a majority of the Court in this case.

It is said the words "may have executed" do not speak as of the time of passing the Act. But in my judgment the plain answer to this is, that the Legislature HAS SAID the Act *shall take effect* from the date of its passage. In face of this clear mandate, how can the Court say it shall not take effect then, but at some future time, and as contracts may be made to give it operation? I cannot yield my assent to any such proposition. In my judgment it amounts to a substitution of the judicial for the legislative will.